**FILED**

NOV 05 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
         DEPUTY CLERK

1  ERIC GRANT
   United States Attorney
2  MICHAEL D. ANDERSON
   ROSANNE RUST
3  KATHERINE T. LYDON
   Assistant United States Attorneys
4  501 I Street, Suite 10-100
   Sacramento, CA 95814
5  Telephone: (916) 554-2700

6  ALEXANDRE DEMPSEY
   Trial Attorney
7  Public Integrity Section
   U.S. Department of Justice
8  1301 New York Avenue, NW
   Washington, D.C. 20530

10 Attorneys for Plaintiff
   United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> SEAN MCCLUSKIE, <br><br> Defendant. | CASE NO. 2:25-cr-0253 TLN <br><br> 18 U.S.C. § 371 – Conspiracy (1 count); 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture |

# INFORMATION

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Commit Bank Fraud and Wire Fraud]

The United States Attorney charges:

SEAN MCCLUSKIE,

defendant herein, as follows:

///

///

///

INFORMATION

1

## I. INTRODUCTION

At all times relevant to the Information:

### A. The Conspirators

1. Co-Conspirator 1 was the founder and owner of Company A. Co-Conspirator 1, through Company A, provided public affairs, lobbying, and political consulting services to entities attempting to influence decision making in California government. In or about late 2022, Co-Conspirator 1 left her private employment and accepted a position as the Chief of Staff to a California elected official. She held that position until in or about December 2024.

2. Co-Conspirator 2 was a former California public official, and the founder and owner of Company B. Through Company B, Co-Conspirator 2 provided consulting services to those seeking to influence legislation and decision making in California government.

3. Co-Conspirator 3 was a registered lobbyist and a founding member of Company C, a hub for public affairs, campaign, crisis management, communications and lobbying firms in California. Co-Conspirator 3 also founded and owned Company D, a lobbying company which represented clients seeking to influence legislation and decision making in California government.

4. SEAN MCCLUSKIE was a federal employee serving as the Chief of Staff to Public Official 1. As the Chief of Staff to Public Official 1, MCCLUSKIE had significant influence over federal decision making and contracts. In that position, he was also bound by federal ethics and disclosure rules regarding outside income and employment. MCCLUSKIE resided near both Sacramento, California and Washington, D.C., traveling back and forth between the two locations from 2022 through 2024.

5. Co-Conspirator 5 ("MCCLUSKIE's spouse") was a stay-at-home mother, who had prior work experience in the media industry.

### B. The Dormant Campaign Funds

6. Public Official 1 was a federal public official but had previously held other federal and California state positions. MCCLUSKIE had worked for Public Official 1 for many years while Public Official 1 held a variety of public offices. Based on the prior relationship and MCCLUSKIE's position as Chief of Staff, MCCLUSKIE had a relationship and position of trust with respect to Public Official 1

1  and Public Official 1's campaign organization.

2      7.    Immediately prior to accepting his federal appointment, Public Official 1 served in a
3  California state elected office. As a state elected official, Public Official 1 maintained one or more bank
4  accounts containing campaign contributions that were designated for future electoral campaigns.

5      8.    When Public Official 1 entered federal office, federal ethics rules prohibited Public
6  Official 1 from actively engaging in campaign-related activities. To comply with these rules, Public
7  Official 1 stopped campaign activity, allowing his campaign account to become dormant. Public
8  Official 1 moved the existing state campaign funds to a new campaign account for a future campaign.
9  In these accounts (collectively, "the dormant campaign accounts" or the "campaign accounts"), the
10  funds were to be used for basic account maintenance and not for any active campaign-related activity.
11  Public Official 1 delegated to MCCLUSKIE responsibility for arranging for the funds in the dormant
12  campaign accounts to be monitored and overseen by a third party.

13      9.    Law Firm 1 was a California-based law firm that specialized in providing legal advice
14  related to campaign finance laws and regulations and in managing campaign accounts. It was led by
15  Lawyer 1, an experienced legal practitioner, and employed a number of lawyers and non-lawyer
16  employees. Law Firm 1 oversaw the dormant campaign accounts for Public Official 1, issued payments,
17  and prepared campaign financial disclosures that were required under California state law.

18      10.    Before Law Firm 1 would issue a payment from the dormant campaign accounts, Law
19  Firm 1 required authorization of the payment or recurring payments. Law Firm 1 would review the
20  payments and the payments' stated purpose to ensure compliance with rules and regulations regarding
21  expenditure of campaign funds. Law Firm 1, however, was not responsible for ensuring that the
22  services or goods billed were, in fact, provided. Nor was Law Firm 1 responsible for conducting
23  independent research into the purpose of the expenditures. Instead, MCCLUSKIE, or a person
24  designated by MCCLUSKIE, was responsible for authorizing payments and ensuring that the payments
25  were for goods and services that were provided as stated. Except for the payments that are the subject of
26  the charges in this Information, payments from the dormant campaign accounts were typically for small
27  amounts for expenses such as website maintenance and minor office expenditures.

28      11.    When a payment was approved, or a previously-approved recurring payment invoiced,

Law Firm 1 would authorize payment from the dormant campaign accounts. The dormant campaign account funds were held at Bank 1.

12. Bank 1, as well as Bank 2 and Credit Union 1, were financial institutions as defined in Title 18, United States Code, Section 20.

## II. THE CONSPIRACY AND ITS OBJECTS

13. From in or about February 2022, through in or about September 2024, in Sacramento, El Dorado, and Yolo Counties, within the State and Eastern District of California, and elsewhere, defendant MCCLUSKIE did knowingly and intentionally combine, conspire, confederate, and agree with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, and Co-Conspirator 5, and others known and unknown to the United States to commit offenses against the United States, with each offense constituting an object of the conspiracy, to wit:

   a. To knowingly execute and attempt to execute, a scheme and artifice to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of materially false and fraudulent pretenses, representations, promises, half-truths and the omission of material facts for which there was an independent duty to disclose, that is, Bank Fraud, in violation of Title 18, United States Code, Section 1344(2).

   b. To knowingly devise, intend to devise, and participate in a material scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, promises, half-truths, and the omission of material facts for which there was an independent duty to disclose, and to cause interstate and foreign wire transmissions, that is Wire Fraud, in violation of Title 18, United States Code, Section 1343.

14. The purpose of the conspiracy and scheme to defraud was to steal money from Public Official 1's dormant campaign accounts for MCCLUSKIE's own benefit. The money taken from the dormant campaign accounts was covertly funneled through companies controlled by Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 to hide the money's origin and avoid detection. Then it was disguised as pay to MCCLUSKIE's spouse for a "no-show" job and transferred into an account controlled by MCCLUSKIE.

### III. MANNER AND MEANS

In furtherance of the conspiracy, the conspirators employed, among others, the following manner and means:

15. In or about February 2022, Co-Conspirator 1, who was working in public affairs and lobbying, and MCCLUSKIE, who was a federal employee, met and discussed MCCLUSKIE's desire to have more money while continuing to work as Chief of Staff to Public Official 1.

16. MCCLUSKIE and Co-Conspirator 1 agreed that Co-Conspirator 1 would bill Public Official 1's dormant campaign account for purported consulting services for overseeing the account at a rate of $7,500 per month. This money was intended to subsidize $10,000 payments that Co-Conspirator 1 would make each month to benefit MCCLUSKIE financially.

*Conduit payments*

17. Beginning in or about April 2022, as agreed, Co-Conspirator 1 paid $10,000 per month to Company C, an entity which was consistently controlled by Co-Conspirator 3, with, at times, Co-Conspirator 1 or Co-Conspirator 2, over and above any payments she would otherwise make to Company C. Company C, through a third-party payroll services provider, then paid $10,000 per month into a bank account MCCLUSKIE controlled. These payments were disguised as income to MCCLUSKIE's spouse for work supposedly done for Co-Conspirator 1. In fact, MCCLUSKIE's spouse did not do any work for Co-Conspirator 1, Company A, or Company C, and MCCLUSKIE's spouse did not communicate with Co-Conspirator 1 once the paperwork was completed to initiate the payments.

18. In or about November and December 2022, as Co-Conspirator 1 was preparing to reenter state government service, Co-Conspirator 1 arranged for Co-Conspirator 2 to join the conspiracy in order to take over Co-Conspirator 1's role in concealing the payments to MCCLUSKIE. In early 2023, Co-Conspirator 2 began billing the dormant campaign account for purported consulting services at a rate of $10,000 per month. Typically, once Co-Conspirator 2's company (Company B) received the money, Co-Conspirator 2, or someone at her direction, would deposit the money into an account at Bank 2. Co-Conspirator 2 would then pass the $10,000 payment through to Company C. In some instances, Co-Conspirator 2 would pass through the money before receiving it from the dormant campaign account.

Company B's payments to Company C were generally disguised by inflating the amount of rent and overhead Company B paid Company C each month, increasing the purported rent payments from approximately $10,700 to $20,700. Company C, which was consistently controlled by Co-Conspirator 3, with, at times, Co-Conspirator 1 or Co-Conspirator 2, would then pay $10,000 through a third-party payroll provider into an account MCCLUSKIE controlled at Credit Union 1. These payments continued to be disguised as pay for work supposedly performed by MCCLUSKIE's spouse for Co-Conspirator 2. MCCLUSKIE's spouse, however, did not do work for Co-Conspirator 2, Company B, Company C, or Co-Conspirator 3.

19. The flow of the money from the dormant campaign accounts to MCCLUSKIE is represented, in summary, graphically below:



*False statements and omissions*

20. As part of the conspiracy, and in furtherance of their scheme, the conspirators made and caused others to make materially false statements, and material omissions for which they had an independent duty to disclose, to initiate and continue payments from the dormant campaign accounts.

21. The false statements and omissions included those made by MCCLUSKIE and Co-Conspirator 1 to Public Official 1. For example, MCCLUSKIE had conversations with Public Official 1 to initially set up the payments and again when Co-Conspirator 2 replaced Co-Conspirator 1 as the conduit. In those discussions, MCCLUSKIE informed Public Official 1 that $10,000 per month was a reasonable amount to pay for monitoring the dormant campaign accounts and that Co-Conspirator 1, and later Co-Conspirator 2, were willing to take on the role. MCCLUSKIE also told Public Official 1 that MCCLUSKIE's spouse had obtained employment working with Company A. MCCLUSKIE and Co-Conspirator 1, however, intentionally misrepresented and concealed material facts from Public Official 1, including falsely representing that the money from the dormant campaign accounts was payment for

consulting services to Co-Conspirator 1 and, later, Co-Conspirator 2. MCCLUSKIE and Co-Conspirator 1 also omitted and concealed that the money was being passed through to MCCLUSKIE's spouse, that his spouse was not doing any work, that his spouse was not working for any other clients of her purported employers, and that the payments from the dormant campaign account were not for the purpose of obtaining consulting services but were rather a means to personally enrich MCCLUSKIE. MCCLUSKIE and Co-Conspirator 1 made these misrepresentations and omissions because they believed, correctly, that Public Official 1 would not have permitted the payments if Public Official 1 had known the truth.

22. The invoices Co-Conspirator 1 and Co-Conspirator 2 submitted to Law Firm 1 to initiate the payments from the dormant campaign accounts were also false and misleading in that they claimed the money they were paid was for Co-Conspirator 1 and Co-Conspirator 2 providing consulting services to the campaign. In fact, the money was not being paid for those services; instead, the money was being paid so that it could be passed through to MCCLUSKIE. Had Law Firm 1 known the true facts, it would not have made the payments.

23. To make it appear to Law Firm 1 as though the invoices from Co-Conspirator 1 and Co-Conspirator 2 were for legitimate services rendered, MCCLUSKIE would personally approve or have his spouse approve the invoices. In doing so, the personal relationship between MCCLUSKIE and his spouse, who had a different surname, was not disclosed to employees at the Law Firm 1. This omission was material in that it made it less likely that Law Firm 1 would ask additional questions, discover the illegal nature of the scheme, and refuse to issue payments.

*Additional false statements and omissions*

24. To further support the scheme and prevent or delay its detection, the conspirators also made, or caused others to make, materially false statements and omissions in state campaign financial disclosures, to government ethics counsel, and to the media.

25. As alleged above, MCCLUSKIE, Co-Conspirator 1, and Co-Conspirator 2 provided false and misleading information about the dormant campaign expenses, including through emails and invoices sent to Law Firm 1's employees. In addition to using this information as described above to issue payments from the dormant campaign accounts, Law Firm 1 used this information to prepare

INFORMATION                                                                  7

California Fair Political Practices Commission (FPPC) Form 460 campaign disclosures. Because the information provided to Law Firm 1 was false and misleading, Law Firm 1 prepared Form 460s that falsely reported that the monthly campaign expenditures to Co-Conspirator 1 and Co-Conspirator 2 were for campaign consultant services. The Form 460s were then reviewed by MCCLUSKIE and/or Public Official 1 and publicly filed with the California Secretary of State. This created the false appearance of propriety and legal review related to the payments, which furthered the scheme by making it less likely that it would be detected by Public Official 1 and Law Firm 1, either directly, or through public or media scrutiny of the arrangement.

26. Likewise, when MCCLUSKIE sought ethics approval for his wife's employment from the counsel's office at the federal department where he was Chief of Staff, MCCLUSKIE intentionally concealed that the employment was for a no-show job and that his spouse's pay would come from money passed through a conduit scheme from Public Official 1's dormant campaign funds. Instead, MCCLUSKIE affirmatively misrepresented that his spouse would be working as a "communications consultant" "advising on digital ad placements and misc. communications for political campaigns." This was not just a misrepresentation that MCCLUSKIE's spouse would be working when she was not; it was also part of the misrepresentation about who she would be doing work for and how she was getting paid.

27. Communications consulting for political campaigns was a job that was unnecessary and illegal for the dormant campaign because Public Official 1 was prohibited from campaigning while serving in a high-level appointment in the federal government. By claiming that his spouse was performing that type of work, MCCLUSKIE, in effect, represented that his spouse was doing work that was unconnected to Public Official 1's dormant campaign accounts. As a result of these false statements and omissions, MCCLUSKIE obtained ethics approval for his spouse's purported employment. This further created an unwarranted aura of legitimacy around the payments, including reducing the likelihood of objections from Public Official 1 who expected that ethics counsel would be consulted about the propriety of the purported employment relationship.

28. In or about April 2024, Co-Conspirator 1, after consulting with one or more co-conspirators, also approved a false and misleading statement for Law Firm 1 to provide in response to a

press inquiry. In the statement, Law Firm 1 repeated false information about Co-Conspirator 2's consulting work for the campaign and concealed the pass-through nature of the scheme, which was unknown to Law Firm 1. This was done in furtherance of the objects of the conspiracy, since it, among other things, helped evade detection of the scheme and allowed it to continue.

*Coordination and cover-up*

29.  Co-Conspirator 1 also worked to coordinate among the members of the scheme when their interests might not otherwise align. For example, when MCCLUSKIE's spouse refused to sign a backdated contract in the Spring of 2024, Co-Conspirator 1 told MCCLUSKIE that she would talk to Co-Conspirator 2 and take care of it.

30.  It was further a part of the manner and means of the conspiracy and scheme, that the conspirators worked together to avoid detection. Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 met and communicated on several occasions in 2024, in varying combinations, to discuss ending or continuing the scheme, to share information pertinent to maintaining the secrecy of the scheme from unknowing participants and outsiders, and to reinforce the bond of secrecy among themselves. MCCLUSKIE, Co-Conspirator 1, and Co-Conspirator 2 also met and communicated in varying combinations on several occasions in 2024 for the same purpose. For example, on or about July 29, 2024, when Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 discussed the scheme prior to Co-Conspirator 2 interacting with Lawyer 1 regarding the payments from the dormant campaign account, Co-Conspirator 2 asked Co-Conspirator 1 if Lawyer 1 was aware of the scheme. Co-Conspirator 1 answered, quietly whispering, "no."

31.  Likewise, later in the conversation, Co-Conspirator 3 reinforced the importance of not having payments from the campaign account to Co-Conspirator 2 end at the same time the payments to MCCLUSKIE's spouse stopped. Instead, Co-Conspirator 3 suggested paying MCCLUSKIE's spouse for a few more months than Co-Conspirator 2 billed the campaign. The extra payments, Co-Conspirator 3 suggested, would make it appear as though the two sets of payments were unconnected, thereby helping to conceal that the purpose of the dormant campaign account payments was so that they could be passed through to MCCLUSKIE.

32.  When the scheme ended in or about September 2024, MCCLUSKIE, with the help of Co-

Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, and Co-Conspirator 5, had stolen approximately $225,000 of campaign funds for MCCLUSKIE's own use.

### IV. OVERT ACTS

In furtherance of said conspiracy and to accomplish its objects, at least one of the conspirators committed, or caused to be committed, in the State and Eastern District of California, the following overt acts, among others:

33. On or about February 18, 2022, Co-Conspirator 1 and MCCLUSKIE met in person at a restaurant near midtown Sacramento, California, where they began planning the scheme.

34. On or about February 22, 2022, MCCLUSKIE and Co-Conspirator 1 exchanged text messages regarding the scheme:

| | |
|---|---|
| MCCLUSKIE: | Talked to [Public Official 1]. He wanted me to talk to you. Let me know when is a good time to call. |
| Co-Conspirator 1: | I'm scared. |
| MCCLUSKIE: | I can talk now. Don't be scared. |
| Co-Conspirator 1: | Call me |

35. On or about February 22, 2022, MCCLUSKIE called Co-Conspirator 1's phone. The call was connected for approximately 20 minutes.

36. On or about March 9, 2022, Co-Conspirator 1 and MCCLUSKIE texted about delays involving the Law Firm 1:

| | |
|---|---|
| MCCLUSKIE: | Staying or leaving is complicated and happy to talk more. Is there a way to get [Lawyer 1] moving like [Public Official 1] or myself calling him? |
| Co-Conspirator 1: | I didn't tell him it was for you |
| Co-Conspirator 1: | I called again this am |
| MCCLUSKIE: | BTW, I don't want you paying for this. I appreciate it. |

37. On or about March 10, 2022, MCCLUSKIE texted Co-Conspirator 1 that "[Public Official 1] wants to know a reasonable amount to pay someone to manage his accounts . . . he is looking for an example of some firm that puts in writing that this is what they would charge."

38. On or about March 14, 2022, Co-Conspirator 1 met with Public Official 1 at

INFORMATION                                     10

MCCLUSKIE's encouragement.

39. Following Co-Conspirator 1's meeting with Public Official 1, on or about March 14, 2022, Co-Conspirator 1 texted Lawyer 1, "Hey. Talked to [Public Official 1] so give me a call when you can."

40. On or about March 17, 2022, Co-Conspirator 1 texted Lawyer 1, "Let's do 7500. Start March 1 ongoing with 30 day out."

41. On or about March 18, 2022, MCCLUSKIE emailed Co-Conspirator 1 seeking information that he could provide to ethics counsel at MCCLUSKIE's federal employer regarding his spouse's purported employment with Company A.

42. On or about March 21, 2022, MCCLUSKIE texted Co-Conspirator 1, "I sent you an email with the questions that [Federal Agency] will want an answer [on]. . . . We can move on hiring [my spouse] before that process plays out. It would be best for us if [she] is hired as an employee so I do not have to figure out taxes. Let me know what I have to provide to you to get the process started."

43. On or about March 28, 2022, Co-Conspirator 1 emailed MCCLUSKIE information to provide to ethics counsel regarding MCCLUSKIE's spouse's purported employment with Company A. Co-Conspirator 1 stated that MCCLUSKIE's spouse would be "Advising on digital ad placements and misc. communications for political campaigns."

44. On or about March 28, 2022, MCCLUSKIE texted Co-Conspirator 1 asking, "How do we move [my spouse] forward with getting [her] hired on? I have some commitments to make so I am just trying to make sure we are good for March."

45. A few days later, on or about April 1, 2022, Co-Conspirator 1 responded to MCCLUSKIE and she said, "You are good for March. Give [your spouse] my contact and I'll get it all set up."

46. On or about April 5, 2022, MCCLUSKIE texted Co-Conspirator 1 to ask, "Is there any chance you could pay [my spouse] this week for March? We are making monetary commitments for travel and I want to make sure I have the resources. Thanks."

47. On or about April 20, 2022, MCCLUSKIE repeated the information provided by Co-Conspirator 1 on or about March 28, 2022, in an email to ethics counsel.

48. On or about August 8, 2022, Co-Conspirator 1 or someone acting at her direction emailed Lawyer 1 an invoice for $45,000 requesting payment for "Consulting" "Account Maintenance (March – August 2022."

49. On or about August 19, 2022, in reply to an email chain from Lawyer 1 asking, "Can you confirm that we are authorized to make this $45,000 payment to [Co-Conspirator 1] for consulting fees," MCCLUSKIE emailed stating that Co-Conspirator 1's invoice was approved, "Yes. It is approved. [Pronoun representing Public Official 1] wanted to compensate her for her work with the campaign accounts."

50. On or about November 2, 2022, Co-Conspirator 1 called MCCLUSKIE. The call was connected for approximately eight minutes.

51. On or about November 2, 2022, Co-Conspirator 1 initiated a group text message chain introducing Co-Conspirator 2 to MCCLUSKIE.

52. On or about November 2, 2022, MCCLUSKIE called Co-Conspirator 2. The call was connected for approximately 16 minutes.

53. On or about November 21, 2022, Co-Conspirator 1 or someone acting at her direction emailed an invoice for $32,500 to Law Firm 1 requesting payment for "Consulting" "Account maintenance" for September to December 2022.

54. On or about December 5, 2022, a Company C employee emailed Co-Conspirator 1 asking if MCCLUSKIE's spouse could be switched from an employee to a 1099 contractor.

55. On or about January 2, 2023, Co-Conspirator 1 emailed Co-Conspirator 3, Co-Conspirator 2, and a Company C employee stating, "[Co-Conspirator 2] will invoice [Public Official 1's] campaign for $10,000 per month via [Company B]" so Co-Conspirator 2 can "cover [MCCLUSKIE's spouse's] contract ($120,000)."

56. On or about January 24, 2023, Co-Conspirator 1 emailed Lawyer 1, copying Co-Conspirator 2, stating "Hi – Including [Co-Conspirator 2]; [he/she] will be your contact going forward. Invoices will now be for $12,500/mo. per [MCCLUSKIE's initials]. D."

57. On or about January 24, 2023, Co-Conspirator 1 emailed MCCLUSKIE's spouse and Co-Conspirator 2, stating "[MCCLUSKIE spouse] – Please meet [Co-Conspirator 2] who will be handling

1 your invoices going forward. [Co-Conspirator 1]."

58. On or about January 24, 2023, MCCLUSKIE's spouse sent an email to a Company C employee clarifying that it was $10,000 per month, not $12,500.

59. On or about January 24, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

60. On or about January 24, 2023, MCCLUSKIE approved Co-Conspirator 2's first invoice for "consulting services" to the dormant campaign.

61. On or about January 30, 2023, a Company C employee sent an email to Co-Conspirator 3 and Co-Conspirator 2, stating "Below is the February contribution to [Company C]: [Co-Conspirator 2]: $10,700 + $10,000 (Feb [MCCLUSKIE's spouse] = **$20,700**"

62. On or about February 15, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

63. On or about February 17, 2023, MCCLUSKIE responded to Law Firm 1's request to "auto-pay" the "monthly invoices from [Company B] moving forward" by declining that request and instead, informing it that MCCLUSKIE's spouse would be taking over for him as the person handling the invoice approvals for the payments sought by, or on behalf of, Co-Conspirator 2 and Company B.

64. On or about February 21, 2023, a Company C employee emailed Co-Conspirator 3 and Co-Conspirator 2, asking: "[Co-Conspirator 3] . . .—let me know if you'd like me to transfer [the funds]. [Co-Conspirator 2]: $10,700 + $10,000 (March [MCCLUSKIE's spouse]) = $20,700 (I invoiced [Lawyer 1] on 2/14 for March so you should receive payment soon.)"

65. On or about February 21, 2023, Co-Conspirator 2 responded by email to the Company C employee and Co-Conspirator 3 that, "I will write a check once I get the funds from [Lawyer 1]!"

66. On or about March 1, 2023, MCCLUSKIE's spouse again refused to give "approval to automatically pay the monthly [Company B] invoices" and instead, had Law Firm 1 "continue to send the invoices to [her] for approval."

67. On or about March 3, 2023, a Company C employee emailed MCCLUSKIE's spouse explicitly linking the payments from the campaign to the pass-through payments:

"I wanted to touch base and let you know that I'm awaiting payment from

INFORMATION 13

the campaign, then I'll send your monthly fee. I expect it will be early next week. Going forward, would you prefer that I send the payment when I receive payment from the campaign, or would you prefer that I just send it at the end of the month. Just let me know. Thank you[.]

68. On or about March 3, 2023, MCCLUSKIE's spouse responded to the Company C employee's email regarding timing of payments and said, "It would be great if you would s[end] the fee when you receive payment from the campaign. Thanks and have a nice weekend".

69. On or about April 12, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

70. On or about June 14, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

71. On or about April 15, 2024, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

72. On or about April 19, 2024, Co-Conspirator 1 emailed Lawyer 1, approving a statement for the Lawyer 1 to release to a reporter as follows:

> [Co-Conspirator 2] has been paid to oversee the Committee and manage its operations while [Public Official 1] has been serving in Washington, including payment of ongoing expenses and filing of required campaign reports.
>
> [Co-Conspirator 2] has continued to provide committee management services this year and has been paid for those services.

73. On or about May 6, 2024, a Company C employee acting at the direction of Co-Conspirator 2 emailed MCCLUSKIE's spouse a backdated work contract, which purported to have been entered in January 2023, asking MCCLUSKIE's spouse to, "please sign and return."

74. On or about May 9, 2024, MCCLUSKIE called Co-Conspirator 1. Co-Conspirator 1 did not answer.

75. Approximately five minutes later, on or about May 9, 2024, Co-Conspirator 1 called MCCLUSKIE. The call connected for approximately three minutes during which Co-Conspirator 1 said she would take care of the backdated contract with Co-Conspirator 2.

76. On or about June 13, 2024, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

77. On or about July 15, 2024, Co-Conspirator 2 emailed an invoice for "consulting services" to Law Firm 1.

78. On or about July 29, 2024, Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 met at a bar near the California State Capitol and discussed ending the scheme. During the conversation, Co-Conspirator 3 explained the need to obfuscate the connection between the payments from the campaign accounts and the payments to MCCLUSKIE's spouse stating, in part, that "we need to probably eat one or two months so it doesn't line up directly from when you quit and stop paying her" and "whenever you quit we probably have to at least pay one month or otherwise it's going to look—it's going to just raise red flags potentially."

79. On or about August 2, 2024, Co-Conspirator 2 and Co-Conspirator 3 met at Company C's business location in Sacramento, California. Co-Conspirator 3 discussed ending the scheme and stated that it was "always set up to be somewhat icky," amounted to "laundering money," and was "wrong."

80. On or about August 29, 2024, MCCLUSKIE and Co-Conspirator 2 spoke on the phone about Co-Conspirator 2 stopping payments. During this conversation, MCCLUSKIE asked Co-Conspirator 2 to continue the arrangement for a time so he could "transition out" of his federal job and try to get his "pension out of the federal government." He explained that the "money you guys are giving me is helping me fly back and forth to to uh DC and live there half part time."

All in violation of Title 18, United States Code, Section 371.

///
///
///
///
///
///
///
///
///

INFORMATION

15

<u>FORFEITURE ALLEGATION</u>:   [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

Upon conviction of one or more of the offenses alleged in Count One of this Information, defendant SEAN MCCLUSKIE shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, constituting or derived from proceeds traceable to said violations, including but not limited to:

a.   A money judgment equal to the sum of proceeds traceable to violations for which defendant is convicted.

If any property subject to forfeiture, as a result of the offenses alleged in this Information:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the property subject to forfeiture.

*/s/ Eric Grant*
ERIC GRANT
United States Attorney

INFORMATION

16

<u>United States v. Sean McCluskie</u>
**Penalties for Information**

**COUNT 1:**

VIOLATION:        18 U.S.C. § 371 - Conspiracy

PENALTIES:        Up to 5 years in prison; or
                  Fine of up to $250,000; or both fine and imprisonment
                  Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:        18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) –
                  Criminal Forfeiture

PENALTIES:        As stated in the charging document